Form: p
        asia band

Form: q
        pedoland

Form: firstname
        john   eric

Form: lastname
        carpegna

Form: email
        littlehorse2020@yahoo.com
        brandtfurniture@montana.com

Form: address
        2075 cooper st. #634

Form: phone
        406-498-6211

Form: city
        hanford
        missoula
        san larenzo nuovo

Form: state
        wa
        mt.

Form: country
        usa

Form: zip
        59808

http://www.plandarchive.com/vrcp/m/
        User = littlehorse
        Password = manysuns

GOVERNMENT
EXHIBIT

08-14-M.DWM

| Type | Last Visited (-0700) | User | URL | Host | Web Page Title | Index Type |
|---|---|---|---|---|---|---|
| Cached | 07/11/2007 17:03:18 Wed | eric | http://www.plandarchive.com/vrcp/img/2.swf | www.plandarchive.com | | Cache |
| Cached | 07/10/2007 18:18:33 Tue | eric | http://www.plandarchive.com/vrcp/img/vrcp.jpg | www.plandarchive.com | | Cache |
| Cached | 07/09/2007 15:51:48 Mon | eric | http://www.plandarchive.com/vrcp/img/2.swf | www.plandarchive.com | | Cache |
| URL | 07/07/2007 16:54:54 Sat | Eric | http://www.plandarchive.com/zumbz/161/page_10.htm | www.plandarchive.com | | History |
| URL | 07/07/2007 16:54:42 Sat | Eric | http://www.plandarchive.com/zumbz/161 | www.plandarchive.com | | History |
| Cached | 07/07/2007 16:54:39 Sat | eric | http://www.plandarchive.com/zumbz/161/TN_vvi0003.JPG | www.plandarchive.com | video thumbnails preview | History |
| Cached | 07/07/2007 16:54:39 Sat | eric | http://www.plandarchive.com/zumbz/161/TN_vvi0020.JPG | www.plandarchive.com | | Cache |
| URL | 07/07/2007 16:54:27 Sat | Eric | http://www.plandarchive.com/fullcol/members-demo | www.plandarchive.com | Full Collection (members area) [DEMO-VERSION] | Cache |
| URL | 07/07/2007 16:52:54 Sat | Eric | http://www.plandarchive.com/zumbz/210 | www.plandarchive.com | video 10 | History |
| URL | 07/07/2007 16:52:41 Sat | Eric | http://www.plandarchive.com/zumbz/203 | www.plandarchive.com | video 3 | History |
| URL | 07/07/2007 16:52:15 Sat | Eric | http://www.plandarchive.com/vrcp/m | www.plandarchive.com | Virtual Reality CP | History |
| URL | 07/07/2007 16:51:50 Sat | Eric | http://www.plandarchive.com/vrcp | www.plandarchive.com | | History |
| URL | 07/07/2007 16:16:48 Sat | Eric | http://www.plandarchive.com/vrcp/m | www.plandarchive.com | | History |
| Host | 07/07/2007 16:16:30 Sat | Eric | Host: www.plandarchive.com | www.plandarchive.com | | D 07/JUL/2007 - 08/JUL/2007 |
| | | | | | | D 07/JUL/2007 - 08/JUL/2007 |
| URL | 06/30/2007 08:18:25 Sat | Eric | http://www.plandarchive.com/vrcp/?phpsessid=485d76rgf3645324578# ugv456i8i7ohxyfre7i5y3y9o786tregh7354u#en- us&ds=aresusdebeon&bl=en-us&ks=ig843594359685436itgfw54 | www.plandarchive.com | Virtual Reality CP | History |
| URL | 06/30/2007 08:18:21 Sat | Eric | http://www.plandarchive.com/vrcp | www.plandarchive.com | | D 30/JUN/2007 - 01/JUL/2007 |
| Host | 06/30/2007 08:18:21 Sat | Eric | Host: www.plandarchive.com | www.plandarchive.com | | D 30/JUN/2007 - 01/JUL/2007 |
| URL | 06/29/2007 08:28:07 Fri | Eric | http://www.plandarchive.com/vrcp | www.plandarchive.com | | D 29/JUN/2007 - 30/JUN/2007 |
| Host | 06/29/2007 08:28:07 Fri | Eric | Host: www.plandarchive.com | www.plandarchive.com | | D 29/JUN/2007 - 30/JUN/2007 |



GOVERNMENT EXHIBIT

2

CARDILLO  DOJ-NS-0039

**MICHAEL J. SCOLATTI, Ph.D., P.C.**
Licensed Clinical Psychologist #183
Mental Health Professional Person #386
ATSA AND MSOTA CLINICAL MEMBER

P.O. Box 16535
Missoula, Montana 59808
E-mail: mjs@sabersop.org

Phone: (406) 549-4870
Fax: (406) 549-4870
Cell: (406) 370-1619

FEDERAL DEFENDERS
OF MONTANA

AUG 1 9 2008

HELENA BRANCH

August 15, 2008

FORENSIC REPORT:
UNITED STATES v. CARPEGNA

PSYCHOLOGICAL / PSYCHOSEXUAL EVALUATION and
AMENDABILITY TO SEX OFFENDER THERAPY ASSESSMENT:

JOHN ERIC CARPEGNA

**STATEMENT OF CONFIDENTIALITY**

This evaluation of John Eric Carpegna was prepared at the request of his attorney. Because the information contained is of a highly personal and sensitive nature. This report should not be given directly to the client, but the attorney may use this information in preparation of his defense. Please contact this our office before sharing the report with others.

## Referral Information

John Eric Carpegna was referred for psychological and psychosexual evaluation by his attorney, Mr. Michael Donahoe of the Federal Defenders of Montana, Missoula Office. Mr. Carpegna has indicted on charges of one (1) count of Receipt of Child Pornography [Title 18 U.S.C. § 2252A (a) (2)]; one (1) count of Possession of Child Pornography [Title 18 U.S.C. § 2252A (a) (5) (B)]; and one (1) count of Forfeiture [Title 18 U.S.C. § 2253(a)). Mr. Carpegna allegedly knowingly received child pornography and possessed child pornography on his computer and if convicted, Mr. Carpegna will be required to forfeit his computer equipment.

This assessment will address the following areas of concern:

1.  Mr. Carpegna's current psychological functioning.

2.  Mr. Carpegna's personality traits and dynamics in relation to current sex offender research.

3.  Mr. Carpegna's dangerousness to the community.

4.  Mr. Carpegna's amenability to treatment, and possible treatment recommendations.

Assessment Procedures:



GOVERNMENT
EXHIBIT
3
08.14. M.DWM

As part of a comprehensive evaluation, the following procedures were utilized in the formulation of this report:

1.    Clinical Interviews:    07-09-08 (5.0 hrs.)

2.    Minnesota Multiphasic Personality Inventory-2 (MMPI-2)

3.    Millon Clinical Multiaxial Inventory-III (MCMI-III)

4.    Personality Assessment Inventory (PAI)

5.    Risk Assessment Instruments:

- STATIC – 99
- STABLE 2007
- Sex Offender Risk Appraisal Guide  (SORAG)

6.    Hare Psychopathy Checklist – Revised 2nd Edition (PCL-R-2nd Ed.)

7.    Abel Assessment for sexual Interest™

8.    Abel Questionnaire for Men

9.    Paulhus Deception Scales  (PDS)

10.    Psychopathic Personality inventory - Revised  (PPI-R)

11.    Anger Disorders Scale  (ADS)

12.    Polygraph Examination  (07-18-08) by Bob Stotts, Certified Polygraph Examiner

13.    Data Review:  Discovery provided by defense counsel, included approximately 300 pages of Court Documents and Law Enforcement Reports.


Relevant Psychohistory:

John Eric Carpegna was born on March 20, 1958 in Hagerstown, Maryland; he is presently fifty (50) years old. Mr. Carpegna is the oldest child of six (6) children born to his parents Nancy (Myers) Carpegna (76) and Paul Carpegna (deceased Feb 2008 at the age of 81 from bone cancer).  Mr. Carpegna has three (3) younger brothers; Scott (49), David (48) and Patrick (40) and two (2) younger sisters; Gina (38) and Maria (37).  Mr. Carpegna described his parent's marriage as; "Good for the most part.  Mom had an affair with the neighbor guy and I woke up to dad confronting mom.  She repented and he forgave her."

Mr. Carpegna indicated his father was employed by Brandt Furniture for thirty-five years and then bought the company.  He stated his mother was a housewife.  He recalled the family

ONE-S978-YTTA-SU :woɹℲ  ZZ:ET  008S  cə  ɔɕ

was middle income as far as socioeconomic status.

In regards to his early development, Mr. Carpegna indicated to the best of his knowledge his mother experienced a normal pregnancy and delivery. He stated he contracted the normal childhood illnesses and did not suffer from any significant medical problems as an infant, toddler, or young child. In addition, Mr. Carpegna reported to the best of his knowledge he crawled, walked and talked within normal time parameters.

Mr. Carpegna was asked if he was emotionally, physically, and sexually abused during his childhood and adolescence. He outlined:

(Emotional?) "No."

(Physical?) "No."

(Sexual?) "I was like 8 or between 8 and 9 and a man who lived up the street came down and picked me up in his convertible and I thought he was just going to give me a ride but he exposed to me and he told me to masturbate him and I said no at first then he said he was going to hurt my parents so I ended up touching him and he said that he was going to murder my parents if I told. I used to wake up nights and think he was in the house and I'd go crawl into bed with my dad. (How did it continue?) He'd pick me up at different times when he would see me outside and he'd show up and take me off and it would happen in the car or out in the woods. (How often did it occur?) Maybe 15 to 20 times over about a year, year and a half. (How did it stop?) I don't remember, I don't know if he moved away or he couldn't find me. (Any other sexual acts?) No, that was it."

In addition, Mr. Carpegna was asked if his parents had problems in the following areas:

(Chemical Dependency?) "My mom had a problem when I was younger and then she quit. (Problem?) Yah, she'd go out with her friends about every two weeks and come home and dad would be up and she'd come through the door and fall flat on her face. (Quit?) It was bad when I was a young kid then it tapered off and I'd say she hasn't had any in 15 to 20 years."

(Mental Health?) "No."

(Criminal Activities?) "No."

(Domestic Violence?) "Just that night he confronted her about running around and having the affair, I think he slapped her."

Mr. Carpegna was born and raised in Hagerstown, Maryland. He reported leaving home at the age of nineteen (19) when his girlfriend became pregnant and they married. He stated he was never removed from the family home or put in foster care.

Mr. Carpegna described his family life in the following manner:

"Stable, good, loving. (Best family memory?) All the Christmases were good, going crabbing on Chesapeake Bay, that was good. (Worst family memory?) The night my dad caught my mom."

Mr. Carpegna described his relationship to his mother as:

"It was good. (Best memory?) When we go camping, crabbing. (Worst memory?) It still has to be that night."

Mr. Carpegna described his relationship to his father as:

"Excellent, very good. (Best memory?) It's hard to pick one, they're all good. I'd say the camping and crabbing thing again if I had to pick one. (Worst memory?) I don't know of any worst one, my dad was the kindest, lovingest family man."

Mr. Carpegna described his relationship to his siblings as:

"Good, we're all close. I guess me and my brother Dave have done the most together. We've shared houses and apartments together."

Mr. Carpegna reported he experienced significant trauma when he was eight or nine (8-9). years old and was sexually abused. He also reported it was very traumatic being awaken and his parents were fighting about the affair.

Mr. Carpegna reported he attended St. Mary's Elementary School in Hagerstown, Maryland from Kindergarten through the Eighth Grade. Mr. Carpegna related he had to repeat the Fifth grade. He explained; "I just couldn't keep up that year. They kept me back and it was a good thing." He reported he was never diagnosed with a Learning Disorder or Attention Deficit / Hyperactivity Disorder. In addition, he stated he was never placed in remedial classes, special education, or behavioral management classes.

Academically, Mr. Carpegna stated he received "average" grades. Socially, Mr. Carpegna felt he was accepted by his peers. He described; "They were excellent." He claimed to have had many close friends. Mr. Carpegna indicated he participated in Scouting and being an alter boy as extracurricular activities.

Mr. Carpegna reported he was never in any type of serious disciplinary trouble at school during these years. He indicated he was never suspended or expelled. In addition, he stated he was never in a fight.

Mr. Carpegna informed he attended St. Maria Goretti High School in Hagerstown, Maryland from his Freshman year through his Senior year, graduating in 1977. Academically, Mr. Carpegna stated he received "above average, B" grades.

Socially, Mr. Carpegna felt he was readily accepted by his peers. He described; "They were excellent years too." He claimed to have had many close friends. Mr. Carpegna indicated he participated in basketball, Spanish Club, Student Council and Drama Club as extracurricular activities.

Mr. Carpegna reported he was never in any type of serious disciplinary trouble at school during these years. He indicated he was never suspended or expelled. In addition, he stated he was never in a fight during these years.

After leaving high school, Mr. Carpegna indicated he attended a vocational school for fire systems and sprinkler installation for a year and a half. He recalled he attended the University of Maryland from 1977 to 1978 where he went to fire science school and attainted a Certificate of Completion.

Mr. Carpegna cited his primary occupation as fire systems and sprinkler installation for twenty-one (21) years, owning his own company for 5 years; Horizon Sprinkler Company (1992-1997). He then moved to Montana were he was employed by Fire Protection Services from 1998 to 2005. He indicated he went to work for Montana Fire Sprinkler from 2005 until his arrest. Mr. Carpegna related he had never been terminated from a position of employment.

Mr. Carpegna indicated he never entered military.

In regards to substance use, Mr. Carpegna stated he has tried tobacco products, alcohol and drugs. Mr. Carpegna disclosed he first tried cigarettes when he was fourteen (14) years old. He related he smoked consistently in when he was in his twenties and then quit. In regards to alcohol use, Mr. Carpegna related he first tried alcohol when he was eighteen (18) years old. He gave the following account of the use of alcohol throughout his life:

> "Nothing much, just beer, maybe once a week or every other week I'll have 3 or 4. (Have you ever been drunk?) I think I was one time when I was 19 or 20."

Mr. Carpegna reported he had never experienced legal troubles, relationship difficulties, employment problems, and/or medical disorders as a result of his use of alcohol. In addition, Mr. Carpegna indicated he had never voluntarily or involuntarily undergone treatment for alcohol use.

In regards to drug use, Mr. Carpegna related he first tried drugs when he was twenty (20) years old. He stated this was with marijuana. He related the following account of the use of drugs throughout his life:

> "Maybe once a month if that. I bought it a couple of times, most of the time friends had it, but it wasn't a regular thing. (Have you experimented with any other type of illegal drugs?) No. (Have you ever abused any type of prescription medications?) No."

Mr. Carpegna reported he had never experienced legal troubles, relationship difficulties, employment problems, and/or medical disorders as a result of his use of drugs. In addition, Mr. Carpegna indicated he had never voluntarily or involuntarily undergone treatment for drug use.

Mr. Carpegna indicated he is in good health and does not have any significant medical

problems at the present time. In addition, he reported he is not on any medication at this time.

Mr. Carpegna stated he has not received any psychiatric/psychological treatment or evaluation in the past. However, he reported he was diagnosed with panic attacks in 1992 by a medical doctor and prescribed Xanex, which he as taken since 1992.

Mr. Carpegna was asked; "What is the most depressed you have ever been?" He responded; "Probably now, or when I got divorced, or when my dad died." (Have you ever attempted suicide?) "No." Collateral information indicated Mr. Carpegna had threatened suicide in the presence of his girlfriend, Gina Braunreiter. Ms. Braunreiter stated when she confronted Mr. Carpegna about finding child pornography on his computer, he brandished a handgun and put it to his head, threatening to kill himself. At that time, she stated he told her he had been sexually abused as a child and had never told anyone.

Mr. Carpegna indicated he was never arrested or cited as a juvenile for any type of criminal offense. In addition, he stated he was never placed on any type of probation.

As an adult, Mr. Carpegna divulged he was first arrested at the age of forty-seven (47) in 2005 for the crime of Obstruction of Justice. He explained:

> "I was living in Butte and a gentleman that was doing an apprenticeship with me was getting a divorce and he came and banged on my door and I opened it and he ran through my house and said the cops were chasing him and to tell them he wasn't there and he ran out the back. A few seconds later there was another knock the cops asked me if he was there and I said, 'No' and I closed the door. Then I thought what have I done and I opened the door and said he just went out the back. The other cop said you're under arrest."

He stated his only other criminal transgressions were the instant offenses.

While incarcerated, Mr. Carpegna indicated he has not received any disciplinary write-ups for misconduct in the jail.

Mr. Carpegna indicated he has been married on three (3) occasions. His first marriage was to Nina Constable. He stated they met in 1973 when he was fifteen (15) years old and she was fourteen (14). He remembered they met at a pizza parlor. He related they dated for approximately three (3) years before first engaging in sexual relations. Mr. Carpegna recalled they dated approximately five (5) years before getting married. He stated they married in 1979.

Mr. Carpegna outlined the following events in the course of his marriage:

> "She got pregnant so we got married. I remember telling my dad Nina was pregnant and he just put his head in his hands. I was going to go to fire school here in Montana and she got pregnant and that ended that. I didn't have a full time job and I was pretty hysterical. We got married by her grandmother's preacher. I got a full time minimum wage job and we got an

apartment in low income. I found a better job working construction and we got another place. Our daughter Shona was born and Nina became pregnant again and that's when I got the job at Rust-o-leum and that was a good job. I went to a club with my brother, Nina and I weren't getting along that great and I came home and one of my brother's best friends was there and I said what are you doing here and he said I was here to see you. Then 2 weeks later I came home and the place was cleaned out, well it turned out she was in cahoots with this guy and they got married, even though she was in her first trimester with Ryan. He was born and it was horrible because she wouldn't let me see the kids, when I had the kids they didn't want to go with me, Ryan even said that I wasn't his dad. It broke my heart, I never got over it. To this day I still love Nina.

(What problems did you have?) She just fell out of love with me. I wasn't that stable, I didn't have a good job, I was always worried about money. I had a temper and I verbally abused her sometimes. This other guy had a house, a good job, he was stable."

From their marriage, Mr. Carpegna stated he and his ex-wife have two (2) children; Shona (29) and Ryan (27).

Mr. Carpegna indicated when he and his wife argued they became physically assaultive to each other. He described; "She hit me a couple of times, when I would try to leave."

In describing their sexual relationship, Mr. Carpegna revealed his sexual relationship with Nina was "It was good up to the end, then she just laid there. I asked her aren't you into this and she said, no." He estimated they had sexual relations approximately at least once a week. He stated during the course of their marriage they never argued about the frequency or type of sexual relations. Mr. Carpegna divulged during the course of the marriage his wife was not been faithful to him.

Mr. Carpegna disclosed his marriage ended because his wife "fell out of love with him" and had an affair. He stated their divorce was final in 1980-81.

Mr. Carpegna indicated his second marriage was to Sue Bender. He stated they met in 1982 when he was twenty-four (24) years old and she was twenty-three (23). He recalled they met a friend. He related they dated for approximately two (2) months before first engaging in sexual relations. Mr. Carpegna recalled they dated approximately two (2) years before deciding to marry. He stated they married in 1984

Mr. Carpegna outlined the following events in the course of his marriage:

"It was going fine. I quit Rust-O-leum and we moved out here for me to go to Guide School. She hated it out here, but she didn't tell me she didn't want to move here. But this was years in the planning and she knew about it, everybody knew about it because I had to save for it.

She was extremely home sick. I had a blast, I completed the school and got

my certificate. I got a job and just before hunting season she said she was just going back and I said well that isn't going to help the marriage and so her dad offered me a job and I took the job with him and we moved back and I still had some money and we bought a house. After I moved back her father bought this sprinkler business, Interstate Fire Protection and that's how I got started in the business.

Everything was going fine, she was a great cook but she had a marijuana problem. We were commuting to work from West Virginia and I could smell the marijuana at 5 in the morning. By my calculations we should have had $3000.00 in the bank and when I looked there was only $35.00 and I yelled at her about it and she freaked out and she had just said that it costs money to eat well like we did. I was talking to my cousin and telling him about this money stuff and he said, 'well she's buying cocaine from this Bill Sylvester, that's where your money's going.' So I went home and confronted her and she freaked out again and left and moved in with her parents. I was calling her and told her I loved her and I wasn't mad about the money, but 2 weeks later I went home and that place was cleaned out too. Not even 2 weeks later she was going out with this Sylvester guy. I don't know if her parents ever found out about her drug problems."

From their marriage, Mr. Carpegna stated he and his ex-wife did not have any children.

Mr. Carpegna indicated when he and his wife argued they never became physically assaultive to each other.

In describing their sexual relationship, Mr. Carpegna revealed his sexual relationship with Sue was "Good, just normal I'd say." He estimated they had sexual relations approximately once a week. He stated during the course of their marriage they never argued about the frequency or type of sexual relations. Mr. Carpegna stated during the course of the marriage his wife had not been faithful to him.

Mr. Carpegna disclosed his marriage ended because of her drug problems. He indicated he was not sure if they were divorced, assuming the marriage was annulled because it only lasted a year and he did not remember signing any divorce papers. He stated their marriage ended in 1987.

Mr. Carpegna indicated his third marriage was to Tracy Cole. He stated they met in 1989 when he was thirty-one (31) years old and she was twenty-seven (27). He recalled they met a friend. He related they dated for approximately two (2) months before first engaging in sexual relations. Mr. Carpegna recalled they dated approximately two (2) years before deciding to live together and they lived together approximately four (4) years before deciding to marry. He stated they married in 1995.

Mr. Carpegna outlined the following events in the course of his marriage:

"I fell in love with this girl and I still love her. I thought I finally found the girl who would take the pain away from my first marriage. We'd have arguments,

but we got along most of the time. She liked to go out, party, she called it dancing and sometimes I'd go with her and sometimes I wouldn't.

Things were fine, I was working in DC and in Pennsylvania and both were about 2 hours away, one way. I came home one night and she was gone. She came home later and I asked her where she was and she said she took another job in a bar and it turned out she took a job as a stripper. It went downhill from there. I told her she didn't have to do that, I was making enough money and she didn't want to. She'd take my car for 3 days and not come back, there'd be three or four messages on the machine from other guys, it just got too much. Then she got pregnant by another guy when we were separated and so I filed for divorce."

From their marriage, Mr. Carpegna stated he and his ex-wife did not have any children.

Mr. Carpegna indicated when he and his wife argued they never became physically assaultive to each other.

In describing their sexual relationship, Mr. Carpegna revealed his sexual relationship with Tracy was "Good, about the same as the others." He estimated they had sexual relations approximately once or twice a week. He stated during the course of their marriage they never argued about the frequency or type of sexual relations. Mr. Carpegna reported during the course of the marriage his wife has not been faithful to him.

He stated he their divorce was final in 1997.

Since 1997 Mr. Carpegna stated he has not been in a significant relationship. However, he also reported he entered into a relationship with Gina Braunreiter in 2005. The relationship lasted approximately a year-and-a-half. While they never cohabited, Mr. Carpegna stated they lived in separate town, but would stay together for two to three (2-3) weeks at a time. The relationship ended because Ms. Braunreiter discovered the child pornography on Mr. Carpegna's computer and had suspicions he molested her four (4) year-old daughter.

#### Psychosexual History

The proceeding sexual history is the result of Mr. Carpegna's self-report.

Mr. Carpegna acknowledged his first recollection of a sexual awareness occurred when he was eight or nine (8-9) years old. Mr. Carpegna related the following early, (1-12 years old) childhood, sexual experiences:

"When I was abused. (Anything else?) I did see a pornography movie when I was about 14. A neighborhood kid got it from his parents. The guy also took pictures of me with my pants down around my ankles."

Mr. Carpegna was asked the following questions in relation to childhood sexual experiences. His response to each question is given:

1. Have you ever walked in on any of your parents having sex?
   Response: "No."

2. Have you ever seen anyone having sex?
   Response: "No."

3. Have you ever played any sexual games like, "House", "Doctor", "Truth or Dare", "Spin the Bottle", or any other type of kissing, touching, or sexual game?
   Response: "No."

4. Have you ever had any sexual contact at all with brothers or sisters, cousins or any other relatives?
   Response: "No."

5. Besides the sexual abuse, has anyone ever said or done anything sexual to you that embarrassed or confused you?
   Response: "No."

Mr. Carpegna reported the primary sources of information regarding human sexuality were the sexual abuse perpetrated against him and sex education discussions with the principal of his elementary school, and pornography. Mr. Carpegna stated he did not receive any significant information from his parents or friends.

In reviewing his sexual development, Mr. Carpegna gave the following chronology of normal sexual milestones:

- First Date: "I was 16 years old."
- First Kiss: "I was 12 years old."
- First time touched a girl's breast: "I was 17 years old."
- First time touched a girl's vagina: "I was 18 years old."
- First time a girl touched his penis: "I was 18 years old."

Mr. Carpegna indicated all the later milestones all occurred with the same partner, Nina.

In describing his initiation and pattern of masturbatory practices Mr. Carpegna divulged he first masturbated at the age of fourteen or fifteen (14-15). He cited learning the process through self-experimentation. Mr. Carpegna reported the following frequency and pattern of masturbation:

"When I was younger maybe once a week or twice a month. As I got older it decreased to never when I was married. After my last divorce maybe once a month."

Since his incarceration, Mr. Carpegna revealed he masturbated once. Mr. Carpegna indicated the majority (60%) of his masturbation fantasies are of adult partners. He divulged approximately forty (40) percent of his masturbation fantasies involved adolescent girls between the ages of twelve to sixteen (12-16). He denied ever masturbating to prepubescent females. When asked about his specific masturbation fantasies, Mr. Carpegna divulged: "Past stuff with Tracy, most of the time I just think about getting off."

Mr. Carpegna related he used some type of pornography eighty (80) percent of time while masturbating. He disclosed he typically utilized movies and the Internet for this purpose.

Mr. Carpegna disclosed he first experienced sexual intercourse at the age of eighteen (18). He related this experience occurred with Nina (17) who was his girlfriend at the time. He described his feelings at the time as, "I felt good about it, like I was a man."

Since his initial experience with sexual intercourse, Mr. Carpegna revealed he has had twelve (12) sexual partners. He stated none of these have been casual sexual relationships, or one-night stands and all of his sexual liaisons occurred in ongoing emotional-sexual relationships.

In his sexual relationships, Mr. Carpegna stated he has never experienced consistent problems with any type of sexual dysfunction including, premature ejaculation, retarded ejaculation, erectile dysfunction and/or impotence. In addition, Mr. Carpegna indicated he has never had a sexually transmitted disease.

As part of a comprehensive psychosexual history, Mr. Carpegna was interviewed regarding his fantasies and/or participation in the following atypical sexual outlets. The proceeding is a list of the paraphilia, followed by Mr. Carpegna's response:

1. Compulsive Masturbation (masturbation practices that interfere with life):
   Response: "No."

2. Public Masturbation (masturbation in places where the person could be seen:
   Response: "No."

3. Abusive Masturbation (infliction of pain while masturbating):
   Response: "No."

4. Fetish Masturbation (the use of inanimate objects while masturbating):
   Response: "No."

5. Pornography Use (Books/Magazines; Adult Stores; Videos; Internet):
   Response: "Yah. I was 14 when I saw that movie my friend had. Before I had a computer and if I wasn't married every couple of months I'd go to the bookstore and get a movie or video stores with the over 18 section. (About how many X-rated movies have you seen?) I'm guessing, but no more than 50. (Have you ever been to an adult bookstore?) Again, I'm guessing maybe 20 times and the last time was 03' or 04'."

6. Child Pornography: (any type of visual medium using children as sexual objects)
   Response: "I first saw it around 05'. I was watching Fox news, Bill O'Reilly and he was doing a whole big thing about it, it was about a guy who was arrested for murdering this little girl and they were saying we know you have kiddy porn on your computer and I thought what? Then I thought about the guy that took pictures of me, because he took some Polaroids and I thought I wonder if any of those pictures of me were out there. So I got on the Internet and I looked up child

porn and kiddie porn and of course that just led to other stuff. I'm not going to lie to you I found some of the stuff fascinating, arousing, but once I got on there I couldn't believe all the e-mails that were sent to me.

(How often were you going to child sites?) Maybe every couple of weeks. Well maybe more than that because it was coming up so much in my e-mails and I would open it, see it and delete it. (What did you find arousing?) The younger gals their shapes and all."

(How many images did you have on your computer?) I heard 253 and Betsy said there was like 635 thumbnails and then they said there were 8 videos. But I did not download any videos I never looked at any videos."

7.  Live Sex Shows: (strip shows, topless bars, etc.)
    Response: "Yah with guys from work one time."

8.  Obscene Phone Calls: (calling another person (unsolicited) and talking in a sexual manner)
    Response: "No."

9.  Phone Sex (sexual arousal to calling sexually oriented phone services):
    Response: "No."

10. Frotteurism (sexual arousal to touching strangers, usually in crowded places):
    Response: "No."

11. Odors (sexual arousal to noxious odors):
    Response: "No."

12. Exhibitionism (sexual arousal to exposing the genitals to others):
    Response: "No."

13. Voyeurism (sexual arousal to surreptitiously viewing others):
    Response: "No."

14. Transvestism (sexual arousal to dressing in clothing of the opposite sex):
    Response: "No."

15. Bondage (sexual arousal to being bound or tied):
    Response: "No."

16. Discipline (sexual arousal to master-slave relationships):
    Response: "No."

17. Sadism (sexual arousal to the infliction of pain on others):
    Response: "No."

18. Masochism (sexual arousal to the infliction of pain on self):

Response: "No."

19. Urophilia (sexual arousal to urination):
Response: "No."

20. Coprophilia (sexual arousal to defecation):
Response: "No."

21. Homosexual Activities:
Response: "No."

22. Affairs:
Response: "No."

23. Sexual Paraphernalia (sexual activities using sexual props or toys):
Response: "No."

24. Prostitution (paying someone or being paid for sexual activities):
Response: "Yes, when I was 18, once a Geisha House, a massage parlor."

25. Group Sex (sexual activities with more than one person):
Response: "No."

26. Partner Swapping: (sexual activities involving the exchange of dates, partners or wives)
Response: "No."

27. Zoophilia (sexual contact with animals):
Response: "No."

28. Pedophilia (sexual arousal to a prepubescent child):

Response: "I was charged in Dillon for that. The guy, John Braunreiter that got me arrested with the obstruction, I saved his job like 3 times. He was an ex-con, he had 3 kids and he was extremely abusive to his wife. His wife came over to my house twice bawling about him beating her. The police were always at their house, I know of 4 times and I know the police hauled him off a couple of times. She had left him and went to a group home for battered women. He had lost his job and was basically stalking her.

I didn't know she was fantasizing about me. Around Christmas I went to a party and when I came back my door was kicked in and my guns were missing and on the floor was a receipt from a pawn shop with John's name on it. Well he got arrested and he's in prison for the third time. She called me a couple of times and she said she liked me and I said I liked her too and she said no I really mean I like you. And I said thanks but you're too young. At the time I was 48 and she was 24. Well after John broke into my place I was pissed at him and the next time she called and I said, 'Sure I'll go out with you' and she came up from the shelter in Utah and we ended up being together for about a year and a half. We didn't live together we had separate places, I was living in Whitehall and she was

Page 13 of 37

in Dillon going to school. She would stay with me for like three weeks when she had breaks.

We were kind of on the outs this one time, there was some drinking and we smoked some weed together and I don't know but she had a bad day at school or something and she got drunk and passed out with all these candle's lit and I got mad at her because I had my fire training and I had seen people die doing things like that.

I had stayed over and I was on the bed on top of the covers and dressed and her daughter, Savannah came in and got under the covers and when she heard her mom she hid under them and Gina came in and said she had to get up. So I reached under the covers and shook her and said you have to get up come on get up and Gina said I touched her vagina. Savannah was wearing panties and a night shirt. Gina said I did and later Savannah said I did by pointing to her vagina. I can remember a couple of times of wiping her when she went to the bathroom. About 6 months before that she (Gina) had seen some of the e-mails and she knew I had child porn on my computer.

(What happened legally?) Before this computer stuff my lawyer David Visavich had worked out a deal where I would have probation for 5 years, do sex offender therapy and then it would be over.

(Did you get sexually aroused touching her?) A little bit. I could tell she was liking it and I rubbed her a little more than I should have. (How many times did you do that?) About twice"

29. Hebephilia (sexual arousal to adolescents):
    Response: "I've never done anything with a teenager since I was an adult, but I have fantasized about it."

30. Juvenile Sex Offenses (as an adolescent, sexual contact with someone more than 4 years younger, and/or forced sexual contact):
    Response: "No."

31. Manipulative Sex (tricking someone through the use of drugs, alcohol or other ruse to engage in sexual contact)
    Response: "No."

32. Acquaintance/Date/Marital Rape (forcing someone you know, or have a relationship with to engage in sexual activities):
    Response: "No."

33. Rape (forced sexual activity on a stranger):
    Response: "No."

34. Necrophilia (sexual arousal/contact with a dead person or animal):
    Response: "No."

35. Other sexual activities shameful to client (any sexual activity or contact that has caused shame, embarrassment, confusion, humiliation regret OR sexual activities or contact not normally engaged in):
    Response: "No."

## Current Offense:

Mr. Carpegna was asked to give a detailed description of the offense for which he is charged. Mr. Carpegna gave the following narrative:

> "I first got in trouble for this in March of 2005 or 2006. That's when Gina turned me into the cops and they took my HP computer and it had about 250 images, thumbnails, of child porn. Sixteen months later we worked out the deal about the sexual assault. I wasn't sentenced yet and the feds came into my house sixteen months later and take the Acer computer. That's the one they say had 253 images and the eight videos.

> I got a second computer a month and a half before the feds came. (Did you look at porn on the Acer?) I had it come up on e-mails, I don't think I deliberately searched for it, but I did search for teenage girls in swimsuits."

## Behavioral Observations:

John Eric Carpegna is a fifty (50) year-old, divorced, Caucasian male. Mr. Carpegna was clinically interviewed for approximately four (4) hours and psychologically assessed for approximately four (4) hours in the Ravalli County Detention Center in Hamilton, Montana. For the examination Mr. Carpegna was dressed in the traditional jail jumpsuit. His hygiene and grooming were good. He did not exhibit any unusual behaviors, mannerisms, physical characteristics, or speech patterns.

In the clinical examinations, Mr. Carpegna admitted the allegations rendered against him. He discussed viewing the child pornography in a relative candid manner. He was reticent and hesitant to discuss the hands-on molestation of his girlfriend's daughter, but acknowledged those acts when directly asked. His avoidance appeared to be due to shame and embarrassment rather than evasiveness or deception.

Mr. Carpegna was cordial and cooperative during the assessment. He participated in all aspects of the assessment. During the evaluation, Mr. Carpegna displayed an appropriate range of affect, demonstrating a full band of emotions during the interview. The emotion experienced appeared to be congruent with the situations discussed. His demeanor was typically relaxed and congenial. Mr. Carpegna's verbal behavior demonstrated candid, spontaneous and open communication. Overall, Mr. Carpegna's attitude and demeanor throughout the evaluation process seemed to be open, frank and responsive. He discussed embarrassing topics with some candor, even sexual topics that might be potentially damaging to his self-image and case.

Throughout the assessment, Mr. Carpegna was oriented to person, place and time. There was no indication of organic impairment, mental retardation, or psychoses. Mr. Carpegna's memory processes were intact for immediate, short-term, and remote events. Mr. Carpegna's thoughts were coherent, and he expressed his ideas in a consistent and logical manner. Mr. Carpegna's clinical presentation and personal history suggest the presence of a mood disorder, more specifically, Dysthymic Disorder. Additionally, he has a well-documented, concomitant anxiety disorder. There were no historical or current indications of delusions or hallucinations. Mr. Carpegna did not express any homicidal or suicidal ideation, plans, gestures, or past behaviors. Overall, Mr. Carpegna did not appear to be inflicted with any physical or psychological syndrome or disorder that would impair or prevent his ability to understand the current legal proceedings, and to participate in the evaluation process.

## Test Results:

*The following test reports are primarily composed of computer generated statements which are based on the responses given by Mr. Carpegna. These actuarial statements provide the basis for the test results. The descriptions outlined in the assessment are based on clinical observation and judgment.*

### Paulhus Deception Scales (PDS)

The Paulhus Deception Scales are designed to measure a person's tendency to give socially desirable responses on self-report measures. This allows the examiner to examine how Mr. Carpegna is answering the question on other tests. Some people purposely try to manage the impression they give by describing themselves in overly positive terms. Others try to be honest, yet exaggerate their virtues as a result of their self-deception and inaccurate appraisal of their positive qualities. The Paulhus Deception Scales are designed to assess socially desirable responding both as a response set (a temporary tendency caused by the situational demands of the evaluation) and a response style (a personality trait-like tendency apparent whenever the person gives self-reports no matter what the situation).

The PDS contains two subscales: Self-Deceptive Enhancement (the tendency to give honest, but inflated self-descriptions) and Impression Management (the tendency to give inflated self-descriptions because of the situation and audience)

On the PDS, Mr. Carpegna attained scores on all scales within a normal range of functioning. He responded in an appropriate manner and his pattern of responses did not indicate an overt attempt at dissimulation. His response pattern indicates he is aware of his shortcomings, but he wants to appear publicly acceptable. This is likely the result of the forensic nature of the current evaluation. This suggests he tended to respond somewhat self-protectively to the other assessment instruments.

### Minnesota Multiphasic Personality Inventory – 2 (MMPI-2)

Mr. Carpegna responded to the test items in an open, non-defensive manner. He did not attempt to distort the clinical profile through either a "fake good" or "fake bad" type of

response pattern. The profile produced from his responses to the test questions is likely to be a valid representation of his current psychological functioning.

Based on clinical and actuarial interpretation, Mr. Carpegna's responses to the test items generated the following descriptions of his current personality functioning:

Mr. Carpegna reports he is experiencing moderate to severe emotional distress characterized by brooding, anxiety, and worrying. He is very fearful, easily frightened, generally apprehensive, and he dreads what might happen to him. He is a chronic worrier who broods and ruminates about himself and his problems. Mr. Carpegna feels life is a strain for him much of the time, and he has little hope of it changing for the better. As a result of his depression, Mr. Carpegna has problems concentrating on a task and difficulty making up his mind because of his ruminations. He is likely to overreact to minor stress with agitation, guilt, and self-punishment.

Mr. Carpegna feels misunderstood, alienated, isolated, and estranged from others. He is lonely, unhappy, and uninvolved. He blames others for his own problems and shortcomings and will often be insensitive and inconsiderate in relationships and later will verbalize regret and remorse for his actions, because internally he feels inferior.

Mr. Carpegna has an ongoing internal conflict between trust and distrust. On the one hand, he views the world as a very threatening place. He is suspicious and mistrustful, and he feels misunderstood and unfairly blamed or punished. He externalizes blame for his problems to sources outside himself. On the other hand, he has extremely naive, trusting, and optimistic attitudes toward other people. He expresses very high moral standards and is righteous about ethical matters and he denies angry or having hostile feelings.

Mr. Carpegna reports he is easily embarrassed, his feelings are easily hurt and he feels that he is more sensitive than most people. He often feels others talk about him in a negative manner and look at him critically. While Mr. Carpegna is comfortable in interpersonal situations, he is often "on guard", fearing others will not like him and be disparaging of him. As a result, he tends to keep people at a distance and often exercises poor social judgment. He is presently experiencing alienation, social withdrawal, difficulty in meeting responsibilities, and a general dissatisfaction with his circumstances.

Mr. Carpegna is unlikely to express anger overtly or to be aggressive toward others. He is very sensitive to criticism or censure and his is easily embarrassed and his feelings are easily hurt. Mr. Carpegna usually represses his anger and then expresses it indirectly, in passive-aggressive ways. It is likely he is not even aware of the levels of anger and resentment he harbors.

Intrapsychically, Mr. Carpegna is sure that he thinks of things that are too bad to talk about, and he is concerned that he has done something wrong or evil. He is afraid of "losing his mind" or "going to pieces" when he is placed in stressful situations. He frequently projects his problems onto others.

Mr. Carpegna's prognosis is somewhat guarded because his problems tend to be chronic and characterologic. Psychopharmacologic interventions are necessary to alleviate his

excessive worrying and ruminations. Cognitive-behavioral treatments focused on his anxiety or other problematic symptoms may be helpful. Short-term, behavioral interventions that focus on his reasons for entering treatment will be most effective.

## Millon Clinical Multiaxial Inventory-III (MCMI-III)

Mr. Carpegna completed all test items. The absence of any omissions suggests cooperation and understanding of the test questions, unless other concerns are noted in the following validity interpretation. There were no unusual responses suggesting random completion of the test. Mr. Carpegna appeared to have understood the instructions and read the items rather than answering indiscriminately.

Mr. Carpegna showed a moderate tendency toward self-abasement, which may be a characterlogical trait or a part of Mr. Carpegna's clinical picture of depression. He often feels empty, guilty, depressed and/or tearful. He has low self-esteem and easily becomes tense, angry or tearful. His response style likely conveys his feelings of extreme vulnerability that are associated with his current episode of acute turmoil..

Mr. Carpegna reported many symptoms associated with depression, anxiety and a moderate level of emotional turmoil in general. He is likely to be depressed, sad, and guilty. Mr. Carpegna has low self-esteem and feels apathetic, anhedonic, and pessimistic compounded by feelings of inadequacy and worthlessness and a diminished sense of pleasure. Generally, Mr. Carpegna can meet his day-to-day responsibilities, but continues to experience a chronic dysphoria.

Additionally, he is likely to be anxious, restless, apprehensive, edgy and jittery. He overreacts to minor problems, often making a "mountain out of a molehill." He often ruminates, worries and broods over his problems or perceived affronts committed by himself, or by others toward him.

Mr. Carpegna reported symptoms often associated with post-traumatic stress. These symptoms might include distressing and intrusive thoughts, flashbacks, startle responses, emotional numbing, problems in anger management, difficulties with sleep or concentration, and psychological distress upon exposure to people, places or events that symbolize or resemble some aspect of the traumatic event. In Mr. Carpegna's case the significant trauma appears to be the sexual abuse he endured as a child.

Based on clinical and actuarial interpretation, the following description of Mr. Carpegna's long-term, characterlogical, personality functioning was produced:

Mr. Carpegna may be described as generally gloomy, pessimistic, overly serious, quiet, passive, and preoccupied with negative events. He often feels inadequate and has low self-esteem. Mr. Carpegna tends to unnecessarily brood and worry and, though he is usually responsible and conscientious, he is also self-reproaching and self-critical, regardless of his level of accomplishment. He may seem to be "down" all the time and is quite hard to please. He tends to find fault in even the most joyous experience. Mr. Carpegna often feels it is futile to try to make improvements in himself, in his relationships, or in any significant aspect of his life because his incessant pessimism leads him toward a defeatist outlook.

His credo is "If I didn't have bad luck I wouldn't have any luck at all." Mr. Carpegna's depressive demeanor often makes others around him feel guilty, since he is overly dependent on others for support and acceptance. He often has difficulty expressing his anger and aggression and perhaps displaces it onto himself. Interestingly, while his mood is often one of dejection and while his cognitions are often dominated by negative thoughts, he does not consider himself depressed.

This personality style is present even in the absence of a clinical depression. Mr. Carpegna's melancholic, sober demeanor, combined with his passivity and self-doubts, puts him at risk for occupational and marital problems.

Concurrently, Mr. Carpegna's long-term personality style is such that he tends to depend on other people for security and support. However, he tends to resent this reliance and prefers to act independently and alone. Mr. Carpegna is passive, submissive, dependent, and self-conscious. He lacks initiative, confidence, and autonomy. His temperament is pacifying and he tries to avoid conflict at all costs. He acquiesces to placate others and "get them off his back." He will say "yes" to a request without any intention to follow through with his obligation. His basic conflict is a fear of abandonment. This fear leads him to be overly compliant in order to ensure himself of security. While he may be competent in a profession or vocation, Mr. Carpegna has a self-image as a weak and fragile person, avoiding responsibilities when he can and thereby precluding any chance of true autonomy. When stressed (with a disruption of security), he is prone to develop anxiety and depressive disorders and possibly substance abuse problems to medicate his dysphoric feelings.

If threatened with abandonment or instability in interpersonal relationships, Mr. Carpegna will relate in a self-sacrificing, martyr-like manner, allowing others to take advantage of them. He seems to search for relationships in which he can lean on others for security and affection. Typically he acts in an unassuming manner, denigrating himself into believing he deserves his fate. Thus, this pattern is repeated in most relationships and therefore he is prone to be abused.

## Personality Assessment Inventory (PAI)

The PAI provides a number of validity indices that are designed to provide an assessment of factors that could distort the results of testing. Such factors could include failure to complete test items properly, carelessness, reading difficulties, confusion, exaggeration, malingering, or defensiveness. For this protocol, the number of uncompleted items is within acceptable limits.

Also evaluated is the extent to which Mr. Carpegna attended appropriately and responded consistently to the content of the test items. Mr. Carpegna attended appropriately to item content and responded in a consistent manner to similar items.

The degree to which response styles may have affected or distorted the report of symptomatology on the inventory is also assessed. The scores for these indicators fall in the normal range, suggesting Mr. Carpegna answered in a reasonably forthright manner and did not attempt to present an unrealistic or inaccurate impression that was either more negative or more positive than the clinical picture would warrant.

Based on clinical and actuarial interpretation, Mr. Carpegna's responses to the test items generated the following descriptions of his current personality functioning:

Mr. Carpegna's clinical profile is marked by a significant elevation on the Anxiety Scale, indicating the content tapped by this scale may reflect a particular area of difficulty for Mr. Carpegna.

Mr. Carpegna indicates that he is experiencing a discomforting level of anxiety and tension. He is likely to be plagued by worry to the degree that his ability to concentrate and attend are significantly compromised. Associates are likely to comment about his over-concern regarding issues and events over which he has no control. Affectively, he feels a great deal of tension, has difficulty relaxing, and likely experiences fatigue as a result of high perceived stress. Overt physical signs of tension and stress, such as sweaty palms, trembling hands, complaints of irregular heartbeats, and shortness of breath are also present.

Mr. Carpegna indicates that he occasionally experiences, or may experience to a mild degree, maladaptive behavior patterns aimed at controlling anxiety. Mr. Carpegna has experienced a disturbing traumatic event (child sexual abuse) in the past-an event that continues to distress him and produce recurrent episodes of anxiety.

According to Mr. Carpegna's self-report, he does not describe any significant problems in the following areas: unusual thoughts or peculiar experiences; antisocial behavior; problems with empathy; undue suspiciousness or hostility; extreme moodiness and impulsivity; unusually elevated mood or heightened activity; difficulties with health or physical functioning. Also, he is not reporting any significant problems with alcohol or drug abuse or dependence.

The self-concept of Mr. Carpegna appears to involve a self-evaluation that has both positive and negative aspects. His attitudes about himself may vary from states of pessimism and self-doubt to periods of relative self-confidence and self-satisfaction. Some fluctuation in self-esteem may be observed as a function of his current circumstances, although these fluctuations will not be extreme and are comparable to those experienced by most adults. During stressful times in particular, he is prone to be somewhat self-critical, uncertain, and indecisive.

Mr. Carpegna's interpersonal style seems best characterized as self-assured, confident, and dominant. Although not unfriendly, he is likely to be described by others as ambitious and having a leader-like demeanor. He is comfortable in social settings, but is not likely to mix indiscriminately, preferring to interact with others in situations over which he can exercise some measure of control.

In considering the social environment of Mr. Carpegna with respect to perceived stressors and the availability of social supports with which to deal with these stressors, his responses indicate that he is experiencing a mild degree of stress as a result of his legal difficulties, but has hope for the future. He reports that he has a number of supportive relationships that may serve as some buffer against the effects of this stress. Mr. Carpegna's current level of distress appears to be related to these situational stressors, and the relatively intact social support system is a favorable prognostic sign for future adjustment.

With respect to anger management, Mr. Carpegna describes his temper as within the normal range, and as fairly well-controlled without apparent difficulty. With respect to suicidal ideation, Mr. Carpegna is not reporting distress from thoughts of self-harm.

Mr. Carpegna's interest in and motivation for treatment is comparable to that of adults who are not being seen in a therapeutic setting. However, his level of treatment motivation is somewhat lower than is typical of individuals being seen in treatment settings. His responses suggest that he is satisfied with himself as he is, that he is not experiencing marked distress, and that, as a result, he sees little need for changes in his behavior. However, Mr. Carpegna does report a number of strengths that are positive indications for a relatively smooth treatment process, if he were willing to make a commitment to treatment.

### Hare Psychopathy Checklist - Revised Second Edition (PCL-R-2 Ed.)

The Second Edition of the Revised Psychopathy Checklist (PCL-R-2 Ed.) is a rating scale for the assessment of psychopathy in males and females in prison and forensic populations. Psychopathy is composed of a variety of personality and behavioral traits including: lack of remorse, manipulativeness, egocentricity, lying and deception, lack of empathy, impulsivity, poor judgment, failure to learn from experience, risk-taking, criminal behaviors, alcohol and drug problems, superficial charm and poor behavioral controls.

The PCL-R is composed of two main factors which assess unique dimensions of psychopathy; Factor 1: Selfish, callous and remorseless use of others; Factor 2: Chronically unstable and antisocial lifestyle; social deviance. Furthermore, Factor 1 is composed of two main facets an Interpersonal and Affective facet and Factor 2 is composed of a Lifestyle and Antisocial facets. The Interpersonal facet describes traits such as glibness, superficial charm, manipulation and grandiosity. The Affective facet describes qualities such as lack of empathy, lack of remorse and shallow affect. The Lifestyle facet assesses behaviors such as impulsivity and irresponsibility. Finally, the Antisocial facet addresses characteristics such as anger problems, juvenile delinquency and overall criminal behaviors.

On this administration of the PCL-R-2-Ed., Mr. Carpegna obtained a total score of 10. The cutoff score to classify an individual as a psychopath is 30. This score does not classify him as a psychopath. The range of scores and scoring descriptors include:

| Score | Descriptor |
|---|---|
| 33 and above | Very High |
| 25-32 | High |
| 17-24 | Moderate / Intermediate |
| 9-16 | Low |
| 8 and below | Very Low |

Therefore, Mr. Carpegna falls in the "Low" range of psychopathic traits. His total score corresponds to the 9.4th percentile when comparing him to a male offender population.

On Factor 1, Mr. Carpegna attained a total score of 4. This corresponds to the 17th percentile when comparing him to a male offender population. On the Interpersonal facet,

Mr. Carpegna's score placed him at the 34th percentile and on the Affective facet, Mr. Carpegna's score placed him at the 16th percentile.

On Factor 2, Mr. Carpegna attained a total score of 3. This corresponds to the 7th percentile when comparing him to a male offender population. On the Lifestyle facet, Mr. Carpegna's score placed him at the 19th percentile and on the Antisocial facet, Mr. Carpegna's score placed him at the 4th percentile.

Overall, Mr. Carpegna's profile does not reflect significant psychopathic features.

## Psychopathic Personality Inventory – Revised

The Psychopathic Personality Inventory – Revised (PPI-R) is an objective personality instrument designed to measure the construct of psychopathy on global and component levels. As conceptualized by several researchers, psychopathy is a constellation of personality features that includes superficial charm, lack of guilt and empathy, dishonesty, failure to form close interpersonal attachments, and failure to learn from punishment. It should be stressed that antisocial and criminal behaviors were neither necessary nor sufficient features of psychopathy, although they are often accompaniments of this condition.

The PPI-R gives a global score of psychopathy, as well as the following facets:

1. *Machiavellian Egocentricity:* This subscale assesses narcissistic and ruthless attitudes in interpersonal functioning.
2. *Rebellious Nonconformity:* This subscale assesses a reckless lack of concern regarding social norms.
3. *Blame Externalization:* This subscale assesses the person's tendency to blame others for their problems and to rationalize their misbehavior.
4. *Carefree Nonplanfulness:* This subscale assesses an attitude of indifference in planning one's actions.
5. *Social Influence:* This subscale assesses a perceived ability by the person to influence and manipulate others.
6. *Fearlessness:* This subscale assesses the absence of anticipatory anxiety concerning harm and a willingness to participate in risky activities.
7. *Stress Immunity:* This subscale assesses the absence of marked reactions to anxiety-provoking events.
8. *Coldheartedness:* This subscale assesses the person's propensity toward callousness, guiltlessness and lack of sentimentality.

On this administration of the PPI-R, Mr. Carpegna responded in a consistent manner to the test item, suggesting he answered the questions thoughtfully and in a congruent manner. However, Mr. Carpegna answered the items in an overly virtuous manner, denying even common personal difficulties to which most individuals will acknowledge. He perceives himself in a positive manner, without serious personality flaws. His score on this subscale fell in the 96th percentile indicating it is likely he denied or repressed the endorsement of problems and difficulties related to the various clinical scales.

His constellation of scores indicates a "Low" total score (10th percentile). On the subscales, Mr. Carpegna attained the following percentiles:

| Scale / Factor | Percentile |
|---|---|
| Machiavellian Egocentricity | 29 |
| Rebellious Nonconformity | 46 |
| Blame Externalization | 71 |
| Carefree Nonplanfulness | 18 |
| Social Influence | 37 |
| Fearlessness | 54 |
| Stress Immunity | 11 |
| Coldheartedness | 12 |

Mr. Carpegna's scores were all within the normal range of functioning. From the results of this administration of the PPI-R, he does not appear to have significant psychopathic traits. Mr. Carpegna's very low score could be the result of a true lack of the problems related to the clinical scales or he is attempting to respond in a socially desirable manner due to the forensic nature of the assessment.

### Anger Disorders Scale (ADS)

The Anger Disorders Scale (ADS) was developed based on clinical work with angry patients who were referred for mental health services due to their problems with the management of their anger. The ADS was designed to assess and identify aspects of anger that may lead to dysfunction and impairment in clinical populations. The scale assesses several domains of anger including: 1) Provocations, 2) Arousal, 3) Cognitions, 4) Motives and 5) Behaviors. Each of these domains of anger are further divided into the various subscales of the ADS which include:

1) Provocations Domain:

    a. Scope of Anger Provocations
    b. Hurt/Social Rejection

2) Arousal Domain

    a. Physiological Arousal
    b. Duration of Anger Problems
    c. Episode Length

3) Cognitions Domain

    a. Suspiciousness
    b. Resentment
    c. Rumination
    d. Impulsivity

4) Motives Domain

    a. Revenge
    b. Tension Reduction
    c. Coercion

5) Behaviors Domain

    a. Brooding
    b. Verbal Expression
    c. Physical Aggression
    d. Relational Aggression
    e. Passive Aggression
    f. Indirect Aggression

On this administration of the ADS, Mr. Carpegna's Total ADS Score fell in the 40th percentile indicating 60 percent of his peer group would score higher than him. This summary score falls in the "No Indication of Anger Pathology" classification. In addition, he attained the following percentile scores on the subscales comprising the ADS:

| Scale | Percentile | Guideline |
|---|---|---|
| Reactivity/Expression (Higher Order Factor) | 42 | No anger pathology |
| Scope of Anger Provocations | 57 | No anger pathology |
| Physiological Arousal | 36 | No anger pathology |
| Duration of Anger Problems | 35 | No anger pathology |
| Rumination | 60 | No anger pathology |
| Impulsivity | 42 | No anger pathology |
| Coercion | 47 | No anger pathology |
| Verbal Expression | 24 | No anger pathology |
| Anger-In (Higher Order Factor) | 44 | No anger pathology |
| Hurt/Social Rejection | 61 | No anger pathology |
| Episode Length | 18 | No anger pathology |
| Suspiciousness | 47 | No anger pathology |
| Resentment | 91 | Moderate anger pathology |
| Tension Reduction | 22 | No anger pathology |
| Brooding | 54 | No anger pathology |
| Vengeance (Higher Order Factor) | 26 | No anger pathology |
| Revenge | 24 | No anger pathology |
| Physical Aggression | 47 | No anger pathology |
| Relational Aggression | 43 | No anger pathology |
| Passive Aggression | 53 | No anger pathology |
| Indirect Aggression | 40 | No anger pathology |
| Positive Impression | N/A | Possible positive response bias |

Mr. Carpegna's responses to the test items indicates problems (75th percentile or greater) in the areas of

• Resentment

The Resentment subscale measures an attitude of hostility based on the belief that one has not received a fair share of life's rewards or that life has treated one unfairly and others better. Mr. Carpegna received an ADS Resentment percentile of 91, indicating moderate anger pathology in this area. A score of this magnitude suggests that he is likely to reflect a great deal on his past disappointments. He probably blames others for his failures and covets others' success, which he likely attributes to luck rather than skills or hard work. Mr. Carpegna may also endorse beliefs that he should have had a better life. A sense of deservingness probably pervades his stream of consciousness. He would most likely benefit from identifying, challenging, and replacing his dysfunctional attitudes. This cognitive restructuring should focus on his beliefs that his life is more harsh and difficult than others' and/or his beliefs in imminent justice (i.e., that the world and others must treat him fairly).

## Abel Assessment *for sexual interest* ™ Interpretation

There are three main issues that this test might assess using its three test result categories. The first is whether Mr. Carpegna has a persistent sexual interest in female children. The second is whether he has a persistent sexual interest in male children. The third is whether he has an interest in sadistic behavior.

The test results on the Abel Assessment fall into two categories.

1.  Objective measures taken beyond Mr. Carpegna's awareness of sexual interest in 160 images depicting children, teens and adults, both Caucasian and African-American, plus depiction of various deviant sexual behaviors. For comparison, Mr. Carpegna also self-reports his ratings of sexual arousal to these same images.

2.  Abel Sex Offender Specific Questionnaire for Men.

### Objective Measures of Sexual Interest

Mr. Carpegna's objective measures to 22-image categories show his sexual interests include:

*   Adult Females
*   Adolescent Females

[It should be noted that it is within the normal range for adult males to self-report sexual arousal to both adolescent and adult females.]

He does not show interest in:

*   Preschool Age Girls.
*   Grade School Age Girls.
*   Preschool Age Boys.
*   Grade School Age Boys.

*   Adolescent Males.
*   Adult Males.
*   Bondage/Sadism to Adult Males.
*   Bondage/Sadism to Adult Females.

*Self-Reported Ratings*

Part of the testing requires Mr. Carpegna to rate each of the images he views on a 1 to 7 scale where the lower the score the more sexually disgusting the image, the higher the rating the more sexually arousing. He is given the instruction, "If you were in a sexual situation with the person you are seeing on the screen, how aroused or disgusted would you be?" He is instructed to give one of the following ratings:

| | | |
|---|---|---|
| 1 = Highly Sexually Disgusting | 4 = Neither Sexually Disgusting | 5 = Slightly Sexually Arousing |
| 2 = Moderately Sexually Disgusting | or Sexually Arousing | 6 = Moderately Sexually Arousing |
| 3 = Slightly Sexually Disgusting | | 7 = Highly Sexually Arousing |

For comparison to his objective measures, Mr. Carpegna self-reported his greatest sexual interest was to Adult Females. He gave this category an average rating of 5.83; "Moderately Sexually Arousing". He rated Adolescent Females lower with an average rating of 4.33 ("Neither Sexually Disgusting or Sexually Arousing"). He rated all other categories as "Highly Sexually Disgusting (Average rating = 1.00).

These results indicate he was relatively accurate in estimating his subjective sexual interest in comparison to his objectively measured sexual interest regarding adult females. However he tended to significantly minimize his subjective sexual interest in comparison to his objectively measured sexual interest in regards to adolescent females.

### Abel Sex Offender Specific Questionnaire for Men

Mr. Carpegna acknowledged engaging in the following sexual behaviors assessed by the test:

- Child Molestation beginning at age 49 and ending at age 49. Mr. Carpegna acknowledged he sexually abused one (1) female child a total of two (2) times. At the current time, he indicated "a few" of his sexual fantasies are about sexually touching a child and he feels he has "absolute" complete control of this sexual behavior.

- Sex with Prostitutes beginning at age 18 and ending at age 18. Mr. Carpegna indicated he had sexual relations with one (1) female prostitute on one (1) occasion. At the current time, he indicated "none" of his sexual fantasies are about having sex with a prostitute and he feels he has "absolute" complete control of this sexual behavior.

- Sex with Strangers beginning at age 26 and ending at age 27. Mr. Carpegna acknowledged he had sexual relations with two (2) adult females on two (2) occasions. At the current time, he indicated "none" of his sexual fantasies are about having sex with a stranger and he feels he has "absolute" complete control of this sexual behavior.

- Pornography Obsession beginning at age 15 and continuing through age 48. Mr. Carpegna acknowledged he viewed pornographic material a total of seventy (70) times. He stated the pornography was heterosexual in nature. At the current time, he indicated "a few" of his sexual fantasies are about using pornography and he feels he has "nearly" complete control of this sexual behavior

Mr. Carpegna denied engaging the following sexual behaviors assessed by the test:

- Sexual Affairs
- Voyeurism
- Exhibitionism
- Fetishism
- Frottage
- Public Masturbation
- Bestiality
- Urophilia/Coprophilia

- Sadism
- Masochism
- Rape
- Transvestism
- Transexualism
- Obscene Phone Calls
- Telephone Sex

*Cognitive Distortion Scale*

Mr. Carpegna's score on the Cognitive Distortion Scale did not indicate the use of cognitive distortions that justify sexual contact with children. Lack of endorsement of these items indicates Mr. Carpegna does not believe on some level, or under any circumstances that sexual conduct between adults and children is permissible. Actual sexual offenders, utilize these justifications to become sexually abusive toward children.

*Social Desirability Scale*

Mr. Carpegna's score on the Social Desirability Scale indicated he was not guarded and willing to admit to minor, common personal shortcomings to which most people will admit. He was guarded, and appeared to respond honestly to the items.

*Danger Registry*

On the Abel Questionnaire for Men, several items are designed to assess an individual's attraction to, fantasies about, and future interest in young boys and girls. Moderate concerns are registered when the person reports fantasies without action. Severe concerns are registered when the person reports actual behavior or behavioral intent. Mr. Carpegna endorsed the following items that would indicate problems with sexual thoughts, fantasies, or behaviors toward young children.

Moderate Concerns:
- Since the age of eighteen, Mr. Carpegna reported sexual fantasies to girls 13 years of age or younger.

Severe Concerns:
- Since the age of eighteen, Mr. Carpegna reported masturbatory fantasies to girls 13 years of age or younger.

## CONCLUSION

Objective measures showed Mr. Carpegna's sexual interests to include: Adult Females and Adolescent Females. As stated earlier, his interest in Adolescent Females cannot be given

ORE-SƎ7A-⅄11H-Sก:woɹᴟ ⅄Ɛ:ƐT ꙅ00ꙅ-Ɛ0-1ꙅ0

much significance as "normal" heterosexual males demonstrate sexual interest in this age group as a result of their development of secondary sex characteristics.

In reference to the main questions addressed by this assessment, Mr. Carpegna does not have a consistent sexual attraction to prepubescent girls, or prepubescent boys or adolescent males. In addition, he does not demonstrate a significant interest to sadism involving men or women

## Risk Assessment Instruments:

### Sex Offender Risk Appraisal Guide (SORAG)

The Sex Offender Risk Appraisal Guide (SORAG) is an actuarial risk assessment instrument designed to predict the risk of violent reoffense. The SORAG summarizes the statistically determined risk of violent recidivism. The appraisal uses only those indicators up to and including the time immediately after the instant offense. The indicators considered are all static characteristics in that they cannot change over time. For example, if Mr. Carpegna was intoxicated at the time of his offense. For the purposes of risk appraisal, violent recidivism was defined as any criminal charge for a violent offense that could result in a criminal charge occurring once the individual has access to the community after the instant offense.

The SORAG was constructed from a study of over 600 offenders, and this sample was supplemented with another 200 sex offenders to allow for the inclusion of some variables specific to sex offenders. Sexual offenses were counted as violent offenses. The SORAG is designed to assess the risk that the offender commits a violent offense within 10 years of his placement in the community.

On the basis of his score on the SORAG, Mr. Carpegna's appropriate nominal category for risk of violent recidivism falls in the Second Category out of nine (9) categories. This falls in the lowest third for offenders. Mr. Carpegna's score fell in the 6th percentile indicating 94 percent of sex offenders in the studies described above obtained higher scores than Mr. Carpegna. Regarding reoffense, only 12 percent in Mr. Carpegna's category reoffended violently (not necessarily sexually) in some manner within an average of 10 years.

### Static - 99

The STATIC-99 is an instrument designed to assist in the prediction of sexual and violent recidivism for sexual offenders. This risk assessment instrument was developed by Hanson and Thornton (1999) based on follow-up studies from Canada and the United Kingdom with a total sample size of 1,301 sexual offenders. The STATIC-99 consists of 10 items and produces estimates of future reoffense risk based upon the number of risk factors present in anyone individual. The risk factors included are the presence of prior sexual offences, having committed a current non-sexual violent offence, having a history of non-sexual

violence, the number of previous sentencing dates, age less than 25 years old, having male victims, having never lived with a lover for two continuous years, having a history of non-contact sex offences, having unrelated victims, and having stranger victims.

On this administration of the Static-99, Mr. Carpegna scored a two (2), the appropriate nominal risk category for this score is Moderate-Low risk. Men with the same risk profile as Mr. Carpegna have been demonstrated to sexually recidivate at a rate of thirteen (13) percent over a ten (10) year follow-up period.

## STABLE-2007

The STABLE-2007 was developed to assess change in intermediate-term risk status, assess treatment needs, and help predict recidivism in sexual offenders. Hanson and Harris (2000, 2007) developed this risk assessment instrument based on a large prospective study from Canada and the states of Alaska and Iowa with a total sample size or 997 sexual offenders. The STABLE-2007 consists of 13 items and produces estimates of stable dynamic risk: based upon the number of stable dynamic risk factors present in anyone individual. The risk factors included are the presence of significant social influences, capacity for relationship stability, emotional identification with children, hostility toward women, general social rejection, lack of concern for others, impulsivity, poor problem solving skills, negative emotionality, sex drive and preoccupation, sex as a coping strategy, deviant sexual preference, and cooperation with supervision.

Mr. Carpegna scored an eight (8) out of a possible 26 points on the STABLE-2007 and this places him as Moderate Needs on this assessment instrument. The STATIC-99 and the STABLE-2007 are then combined into a composite score. As Mr. Carpegna scored as a Moderate-Low risk on the Static-99 this score is combined with Mr. Carpegna's STABLE-2007 score of Moderate needs to produce estimates of sexual recidivism, violent recidivism and any criminal recidivism at four years. Men with the same risk profile as Mr. Carpegna have been seen to recidivate sexually at four (4) percent over four (4) years, placing him in the Moderate-Low nominal risk category for sexual recidivism. Men with the same risk profile as Mr. Carpegna have been seen to recidivate violently at twelve (12) percent over four (4) years placing him in the Moderate-Low nominal risk category for violent recidivism. Finally, men with the same risk profile as Mr. Carpegna have been seen to recidivate criminally at fourteen (14) percent over four (4) years placing him in the Moderate-Low nominal risk category for criminal recidivism.

## Polygraph Examination

(Conducted by Bob Stotts; Certified Polygraph Examiner; 07-18-2008)

### RESULTS:

The subject was then tested using neutral, relevant, and comparison type questions. The relevant questions used, the subject's audible responses and the computer generated analysis follows. The test was first scored by the examiner in the traditional fashion. It was then subjected to computer analysis, which agreed with the examiners conclusions. The subject's polygrams contained specific reactions to relevant questions Q1 and Q4, with

inconclusive to deceptive reactions in the area of Q2. This would and indicate an attempt at deception in at least these areas.

## QUESTIONS AND PERCENTAGE PROBABILITIES: - ERIC CARPEGNA -

Q1. Did you deliberately lie or purposely withhold information from Dr. Scolatti during your discussions with him?
A.    No – Probability of Truthfulness = .2356%

Q2. Did your sexual contact with Savana go any further than what you told me?
A.    No – Probability of Truthfulness = .5319%

Q3. Since becoming an adult, have you sexually touched anyone under 18 that you didn't tell me about?
A.    No – Probability of Truthfulness = .8231%

Q4. Was your interest in child pornography to a greater extent than what you told Dr. Scolatti?
A.    No – Probability of Truthfulness = .3217%

Q5. Did you deliberately search for child pornography of anyone under 8 years old?
A.    No – Probability of Truthfulness = .8564%

Overall Probability of Truthfulness = .5987%

*IMPORTANT NOTE: The above probabilities of truthfulness are only probabilities as stated. These are based upon many criteria but are only an assist to the examiner in the analysis of polygrams. Every subject reacts to questions in a unique manner and the numerical scale consequently is unique to that subject. These results are submitted simply because there may be some value to the person requesting the examination. The ultimate conclusion is made only by the examiner and was reported on the previous page. All questions should be directed to the examiner if clarification is required.*

Diagnostic Impressions:

According to the Diagnostic and Statistical Manual-Fourth Edition-Text Revision (DSM IV-TR), Mr. Carpegna meets the criteria for the following syndromes and/or disorders:

AXIS I:

300.40  Dysthymic Disorder
296.31  Major Depressive Episode (Recurrent)
309.81  Posttraumatic Stress Disorder
302.20  Pedophilia:
            Sexually Attracted to Females
            Nonexclusive Type.
302.90  Paraphilia Not Otherwise Specified: Hebephilia, Compulsive Use of Pornography

AXIS II:

301.90  Personality Disorder Not Otherwise Specified  (Avoidant, Dependent, Histrionic
        features)

AXIS III:  Physical Disorders and Conditions: No Diagnosis

AXIS IV:  Psychosocial and Environmental Stressors:
          -Problems Related to Interaction with the Legal System/Crime
          (Indictment for child pornography, previous sexual assault on a child)

AXIS V:

Global Assessment of Functioning:

(This is a general rating scale of overall mental health. It ranges from 1, which equals most
severe impairment, to 100, which equals superior functioning. The different categories
comprising this scale include:

- 100-91: Superior functioning in a wide range of activities.
- 90-81: Absent or minimal symptoms.
- 80-71: Transient symptoms or slight impairment.
- 70-61: Mild symptoms or some impairment.
- 60-51: Moderate symptoms or moderate impairment.
- 50-41: Serious symptoms or serious impairment.
- 40-31: Some impairment in reality testing or major impairment in social/occupational
  functioning.
- 30-21: Behavior is considerably influenced by delusions or hallucinations, or inability to
  function in almost all social/occupational areas.
- 20-11: Some danger of hurting self or others, or gross impairment in communication, or
  occasionally fails to maintain personal hygiene.
- 10-01: Persistent danger of hurting self or others, or persistent inability to maintain
  minimal personal hygiene, or serious suicidal act with clear expectation of death.

Current GAF:   55

This score indicates moderate symptoms and moderate impairment or problems in social
and/or occupational functioning.

Description: Indictment for child pornography, sexual disorders, PTSD, depression and
            anxiety, personality disorder.


Summary and Recommendations:

John Eric Carpegna is a fifty (50) year-old, thrice-married, Caucasian male. At the time of the
assessment he was unemployed and incarcerated in the Ravalli County Detention Center.

His attorney, Mr. Michael Donahoe of the Federal Defenders of Montana referred Mr. Carpegna for a psychological and psychosexual evaluation to determine his current psychological functioning, dangerousness to the community and possible treatment options.

Mr. Carpegna approached the evaluation in a relatively open and candid manner. As stated earlier, he was reluctant to discuss the hands-on sexual abuse of his girlfriend's young daughter. However, he did acknowledge the abuse and accepted responsibility for his actions, even admitting to sexual arousal and masturbation fantasy about the incidents.

Psychological testing and clinical interview provided convergent results. That is, the test results recognized Mr. Carpegna's depression and anxiety and his long-term Avoidant, Dependent, Depressive personality structure. This was also evident in the interview where Mr. Carpenga consistently tried to impress this examiner with his "good side." This is not to say he was being disingenuous, or manipulative, rather he was attempting to demonstrate that in spite of his sexual transgressions he "really is a nice guy." This feature is at the heart of Mr. Carpegna's personality structure and appears to have it's genesis from the sexual abuse he was subjected conflict he witnessed between his parents as a young child.

Mr. Carpegna's core personality structure that has many avoidant, depressive and dependent features. While he is very desirous of close personal relationships, he fears and does not trust others. Mr. Carpegna wants affection and acceptance and fantasizes about idealized relationships with others. He is not only desirous of intimate relationships, but needs them and dreads their loss. When facing the possibility of such loss, his anxieties become intense, even overwhelming, mirroring the everyday state in which he lives.

Mr. Carpegna tends to hide his anxiety, fears and distress. He feels they are private affairs and does not express them to solicit social attention and support, because he is convinced that such attentions will only bring forth ridicule and abuse. Instead of feeling trapped between desire and loss, Mr. Carpegna often turns his attentions to finding a symbolic substitute, some object or event onto which he can displace and funnel his anxieties, like pornography.

Mr. Carpegna avoids making new friends unless Mr. Carpegna is certain he will be liked and accepted without criticism. Until others pass stringent tests proving the contrary, other people are assumed to be critical and disapproving. Interpersonal intimacy is often difficult for Mr. Carpegna, although he is able to establish intimate relationships when there is assurance of uncritical acceptance. Mr. Carpegna may act with restraint, have difficulty talking about himself and withhold intimate feelings for fear of being exposed, ridiculed, or shamed. Because individuals with this disorder are preoccupied with being criticized or rejected in social situations, Mr. Carpegna has a markedly low threshold for detecting such reactions. If someone is even slightly disapproving or critical, Mr. Carpegna may feel extremely hurt. He is likely to react strongly to subtle cues that are suggestive of mockery or derision. Despite his longing to have an active social life, Mr. Carpegna fears placing his welfare in the hands of others.

Risk Factors and Tier Designation:

*Static and Dynamic Risk Factors Predictive of Sexual Recidivism*

Static variables are those factors that are *never changing.* A static variable will always be there no matter what the offender does, or what occurs in his life.

Dynamic variables are those factors that *can change.* Dynamic variables can be impacted and changed through the offender's behavior and lifestyle.

Robust Static Variables:

1. History of sexual deviance such as diverse types of victims, stranger victims, juvenile sexual offenses and the presence of other sexual paraphilias
2. History of Antisocial lifestyle
3. Higher Psychopathy Checklist scores
4. Higher Violence Risk Appraisal Guide (VRAG) and Sex Offender Risk Appraisal Guide (SORAG) scores

Mr. Carpegna's case, history and testing demonstrates the following factors found to be correlated to characteristics of sex offenders who have a higher risk to reoffend:

1. The presence of crossing of age boundaries in his offense (Child victims of various age groups)
2. Marital status (Mr. Carpegna is not married or in a significant relationship)
3. Victim was unrelated
4. Presence of a Personality Disorder
5. There is evidence of deviant sexual preference as indicated by the number of different boundaries crossed. Examples include: Under 14/Over 14 age of victims; Hands-On/Hands-Off offenses).

In contrast to the high risk factors outlined above, Mr. Carpegna's case, history and testing demonstrates the following factors found to be correlated to characteristics of sex offenders who have a lower risk to reoffend:

1. Lack of a level of deviant sexual interest in boys / girls
2. Older age
3. Higher intelligence level
4. Lack of crossing of gender boundaries in his offense (Child victims of only one sex)
5. Older onset of offending
6. Lack of sexual interest in boys
7. Victim was not a stranger
8. No previous admissions to corrections
9. Absence of sadistic arousal
10. No violence done to victim
11. No prior sexual offenses
12. No extreme mental illness / psychopathology
13. No diagnosis of Antisocial Personality Disorder
14. There is no evidence of diverse anger problems
15. There is one (1) victim

## Important Dynamic Variables

There are two major types of dynamic variables; Stable Dynamic Variables and Acute Dynamic Variables. A Stable dynamic variable is one that is slow in development and difficult to change. An Acute dynamic variable is one that can be quick to develop and can be quickly changed.

### Stable Dynamic Variables

1. Personality Disorders
2. Deviant Sexual Arousal
3. Mental Health Disorders (Axis I diagnosis)
4. Intimacy Deficits
5. Negative Social Influences
6. Attitudes Tolerant of Sexual Offending
7. Emotional / Sexual Self Regulation
8. General Self-Regulation

### Acute Dynamic Variables

1. Substance Abuse Problems
2. Negative Moods
3. Anger, Power and Control Situations
4. Fights with Partner
5. Victim Access and Grooming
6. Sexual Rejection

In Mr. Carpegna's case, the most significant dynamic variables appear to be the following:

- Personality Disorders (Avoidant, Depressive, Dependent)
- Mental Health Disorders (PTSD, Major Depression, Paraphilias)
- Intimacy Deficits (Three (3) unsuccessful marriages)
- Emotional / Sexual Self Regulation (Sexually impulsive)
- Negative Moods (Represses Anger, Depressed, Anxious, Feelings of Rejection)

### Risk Designation:

Mr. Carpegna is designated a Low risk to reoffend. This is based on the results of Clinical interviews, Collateral Information, the Abel Screen for sexual interest™, Abel Questionnaire, Hare Psychopathy Checklist-Revised, 2nd ed., Psychopathic Personality Inventory-Revised, SORAG, STABLE-2007, and the Static-99.

It is important to understand that risk assessments are based on the characteristics found in groups of sex offenders and therefore more accurate when applied to the reference group. There will always be exceptions to the classification system. Some offenders who are designated as "low risk" will reoffend, and some offenders who are designated "high risk" will not reoffend.

## Positive and Negative Prognostic Therapeutic Indicators:

In reviewing the clinical data generated from this evaluation and the documentation provided, the proceeding positive and negative prognostic factors were noted:

*Positive Prognostic Indicators:*

1.  This appears to be Mr. Carpegna's first documented offense. There does not appear to be a chronic, compulsive pattern of sexual abuse involving many victims over many years.

2.  Mr. Carpegna did not demonstrate any sexual interest patterns to prepubescent children on the Abel Screening *for sexual interests*™. This indicates he does not have a persistent sexual interest in young children as he stated.

3.  Mr. Carpegna's offense did not involve physical force or physical harm to his victim.

4.  Mr. Carpegna's offense appears acute and stress related rather than a chronic sexual preference for children.

5.  Mr. Carpegna's offense appears to represent a regression from a usually normal and appropriate sexual arousal/expression pattern.

6.  Mr. Carpegna demonstrated some control and restraint in the expression of sexually abusive behavior. That is, Mr. Carpegna limited his sexual contact to touching of the genitals, and the abuse did not involve more intrusive or violent sexual behaviors.

7.  Mr. Carpegna does not exhibit any major psychopathology such as psychosis, retardation, or organic brain dysfunction.

8.  Mr. Carpegna is not actively alcoholic or drug dependent.

9.  To this point, Mr. Carpegna sexually abusive behavior has been limited to children whom he has a relationship. Mr. Carpegna has not demonstrated a pattern of predatory, stranger oriented behavior.

10. Mr. Carpegna does not have a significant criminal history and aside from the current offense has been a law-abiding citizen.

11. Mr. Carpegna acknowledges responsibility for the offense and has demonstrated a willingness to discuss his abusive behavior.

12. Mr. Carpegna appears to understand the inappropriateness of his abusive behavior and shows empathy for the victim and concern for her welfare.

13. In the past, Mr. Carpegna has demonstrated an ability to be a productive member of the work force.

14. Mr. Carpegna is a relatively self-sufficient person. He is not helpless or dependent and could manage living independently.

15. In his sexual history, Mr. Carpegna shared information that was potentially damaging to his self-esteem and/or legal case.

16. Mr. Carpegna has never denied his culpability in the offense when confronted.

17. The sexual offenses did not involve any bizarre or ritualistic acts.

18. The sexual offenses did not included solicitation of others to engage in the acts, such as other children or adults.

19. The sexual offenses did not involve photographing or videotaping the victims.

*Negative Prognostic Indicators:*

1. Mr. Carpegna's relationship history is checkered. He has never sustained a relationship over five (5) years.

2. Mr. Carpegna suffered significant sexual abuse as a child. The trauma of these early childhood experiences continues to be difficult for him to overcome.

Treatment Recommendations:

1. Mr. Carpegna is a good candidate for therapy. His strengths outweigh his limitations in respect to treatment. This recommendation is from a *therapeutic and rehabilitative* perspective. It is felt that the concept of *punishment* is the Court's domain. From the assessment and evaluation conducted, based on my 23 years of clinical experience in evaluating and treating sexual offenders, I feel Mr. Carpegna does not need a lengthy prison sentence to facilitate his rehabilitation or community safety. After a minimum prison term, I feel he could safely and effectively be treated in a community-based setting without the security of incarceration.

2. If he resides in Montana, Mr. Carpegna should complete an outpatient sex offender treatment program that is a member of the Montana Sex Offender Treatment Association.

3. Mr. Carpegna should abstain from any alcohol or drugs (unless medically indicated) while completing sex offender therapy.

4. Mr. Carpegna should submit to a treatment polygraph examination upon the request of his probation officer or therapist.

5. Mr. Carpegna should not have any unsupervised contact with any female/male children under the age of eighteen (18).

6. Mr. Carpegna should not involve himself in any type of employment, service or

recreational pursuits which involves the supervision of children. Mr. Carpegna should not be in a position of power and authority over children.

7. If Mr. Carpegna owns a computer, or has frequent accessibility to one, the computer should be routinely checked for pornography. It should be listed as a violation of probation if Mr. Carpegna has pornography in his possession.

8. Mr. Carpegna should relinquish or destroy any pornography in his possession. Furthermore, it should be listed as a violation of probation if Mr. Carpegna has pornography in his possession, visits or downloads pornographic Internet websites, visits Internet chat rooms for sexual purposes, frequents adult bookstores, or patronizes establishments where nude dancing is promoted.

Thank you for this interesting and challenging referral. If you have questions about the content of the evaluation please contact me at your convenience.

Respectfully,

Michael J. Scolatti, Ph.D.
Licensed Clinical Psychologist
ATSA & MSOTA Clinical Member
Mental Health Professional Person